IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America

      v.　　　　　　　　　　　　　　　　Docket No. 1:21-CR-178-APM

Markus Maly

**Defendant's Sentencing Memorandum**

Mr. Maly is before the court having been convicted after trial of several crimes related to the January 6 attack on the Capitol. He asks the court to vary below the guidelines because the guidelines do not and cannot provide a just sentence for his actions that day. Though a jury of his peers convicted him, and to be sure, Mr. Maly engaged in wrongful behavior that day, the events of January 6 were unique in their causes and consequences. Mr. Maly fervently believed that the 2020 election was being stolen. He fervently believed that he was protesting in the name of liberty and freedom. His motives, however (factually) wrong they may have been, were based in values this country celebrates. What is more American than fervently defending democracy—even from one's own government—and perhaps especially then? And how ought we to punish someone who, in the throws of such a protest, engaged in minor criminal behavior that was consequential only because it was replicated by thousands? To answer these questions the court must confront issues central to what it means to be American. And in recognizing Mr. Maly's humanity, he asks this court to impose a sentence far outside the advisory range

and far below the government's request. Mr. Maly's counsel suggests that such a sentence is thirty-six months.

On the one hand, the court could examine the actions of Mr. Maly in briefly using a cannister of presumed pepper spray against police officers and in trespassing on Capitol grounds. Alone his actions were insignificant and would not be worthy of a lengthy term of imprisonment. It is only because he was a member of a large mob that his actions had any meaningful impact on society. But his participation in that mob also mitigates his culpability. He acted like thousands of others did in a (rather prolonged) moment of uncertainty, among thousands of like-minded folk, in a unique circumstance not yet faced by this country. Sending Mr. Maly to a lengthy term of imprisonment will not help to stop another January 6 from occurring, nor is such a sentence necessary for Mr. Maly, who has turned his life around and behaved admirably on pretrial release. A sentence commensurate with many of those convicted of similar actions is called for. Such a sentence recognizes the humanity of Mr. Maly as an individual, not merely as one of countless rioters. Such a sentence is commensurate with this court's responsibility under 18 U.S.C. 3553(a). And such a sentence is commensurate with the grace with which the victors ought to treat the vanquished. Such a sentence is, in this case, thirty six months of incarceration followed by a period of supervised release.

**Why we all bear responsibility for January 6th.**

For its entire existence, the promise of America has stood in stark contrast to the America that exists. Concepts central to the nation's founding were betrayed in

its governing document, which recognized that some people could be worth 3/5 a human, and for all its talk of representation, never enshrined a constitutional right to vote. Centuries later, we still battle the same dichotomy, but we understand that governance is something that requires our participation. In search of the promise of America, people have sought to make this country better. In so doing, they recognize a duality between America as she is and America as she ought to be. Others have exploited that duality and argued those seeking progress are undermining America's promises, not furthering them. Until we have not achieved the promise of America for all, we bear some responsibility for the actions of those who wrongly thought they were helping this country, not harming her. January 6 is part of our history, and the court cannot sentence Mr. Maly without first reckoning with the role America played in bringing about the attempted insurrection.[1]

    In this country, we say the national anthem before sporting events—glorifying our country's early history of fighting against tyranny. Nearly everyone stands, and crowds of tens of thousands grow silent to show respect for a flag—not because the fabric deserves respect, but because of the symbolism that it conveys. Usually the flag will be presented by members of the military dressed in uniform. Sometimes law enforcement comprises the color guard.  Many in the crowd may believe that they are showing respect for those who have fought and died for the

---

[1] Mr. Maly notes the obvious here, that he was not charged with seditious conspiracy or many other more-serious charges leveled against organizers, planners, or the seriously violent participants of January 6. He was, rather, someone who was called to Washington by the president, who arrived with peaceful intentions, and who later was found to have committed criminal acts that were part of an attempted insurrection. In recognizing the enormity of the event, Mr. Maly does not argue that his actions were similar to those most culpable nor that he should be treated as such.

"land of the free and the home of the brave." Inherent to this gesture is our populace's respect for those who use force in the name of liberty—either on the battlefield or the home front. But then again, not all feel this way.

Indeed, many people have found peaceful demonstrations made during the national anthem to be disrespectful. The celebrated rights activist and athlete Colin Kaepernick lost his contract for the simple act of taking a respectful knee during the national anthem before football games (a sport that depends on and celebrates violence). Our country was not even prepared to address this simple, quiet protest—how can we expect the country to have been prepared to address claims that its electoral process was hijacked?

Many young children grow up saying the "Pledge of Allegiance" each day at the beginning of school. Though they may recite the words only out of habit, we are asking each young person literally to pledge their allegiance to a country. A tall ask for children many of whom cannot possibly comprehend the true meaning of pledging one's allegiance to a flag or to the "republic for which it stands." But then again, not all feel this way. *See, e.g.*, *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943) (finding unconstitutional a requirement that school children say the pledge of allegiance).

Every July, millions gather to celebrate our country declaring its own independence. We set off literal explosions in the sky to commemorate what we believe this country to represent and to commemorate those who have worked to

ensure the promise of liberty can be felt by all. But then again, not all feel this way. *See, e.g.*, Frederick Douglas, *What to the Slave is the 4th of July?*, July 5, 1852.

These are three simple traditions that are enshrined into American culture that demonstrate both the celebration of America's (often violent) pursuit of liberty and the fact that many disagree about how we celebrate it and how we ought to achieve it. These traditions help to show that America relies on its citizens being willing to stand up for—and to fight for—liberty when it appears threatened. We celebrate those who have died in the name of liberty, and we ask nearly every child to pledge allegiance to this country. What do we expect our citizens to do when the leader of the country (and someone often referred to as the leader of the free world) asks them to "fight like hell" in support of his cause.

**Why this country's history also shows that we should act with grace toward those who, though wrongly, also seek the promise of America.**

Of course, this country does not have a linear history of ensuring that all who live in it can achieve the prosperity sought by the nation's founders. This country was founded on land stolen from natives and conquered in the name of progress. Its original sin may have been the systematic centuries-long push to subjugate Native Americans, or it may have been the systematic enslavement of entire peoples who were kidnapped and chained for not only their lives, but for the lives of their children and their children's children—and on for generations. More than one hundred and fifty years since we fought a war with ourselves to settle the question

of slavery, this country still struggles with, and fails to account for, its treatment of Black Americans.

This is to say that few things are as American as defending core beliefs about democracy—right or wrong though they may be. We have gone to war with others and with ourselves in the name of liberty and justice. We have invaded other countries in the name of liberty and justice. We have changed the past in the name of liberty and justice. Many times we have acted wrongly in the name of liberty and justice though our motives may have been honorable. Mr. Maly does not ask this court to condone his actions on January 6, wrongly done in the name of liberty and justice. But he asks the court to understand why some might have felt compelled to protest, and to occasionally protest with force, when they legitimately believed that doing so was necessary to save democracy.

America has a horrific history when it comes to mob mentality and the behaviors of individuals who are members of a larger crowd. In many respects, we have failed to confront exactly how we should address the violent actions of individuals when done among others. Rather than seek to end the causes of violence, America has largely resolved to scapegoat individuals' actions, whether the incidents were isolated or pervasive. We have done this with police officers who engage in misconduct. We have done this with men who engage in sexual violence. We have done this with Wall Street executives who have caused massive financial loss. And we can choose to do this with people who believed the 2020 election was stolen.

Harper Lee confronted this dynamic in *To Kill a Mockingbird*. Faced with an accusation of a Black man assaulting a white woman, a lynch mob assembled to exert its own perverted form of justice. But how were we to view those in the mob? It was not a show of force that stopped the mob, and Atticus's presence and reason would have been futile. And all the factual and legal arguments in the world failed to stop a different kind of mob assembled in the courtroom that also exerted its own perverted form of justice. But Scout was able to get the mob to dissipate by appealing to someone's humanity—specifically, to Mr. Cunningham's humanity. It was only by reminding him of those aspects they shared that the mob disappeared and became a group of people. This court faces a similar dilemma in sentencing Mr. Maly. All the reason, facts, and arguments in the world cannot convince a person that his beliefs about the election were unfounded, wrong, or based on lies. To the extent the court would send a message to that mob that was assembled, such message cannot take the form of reason for it to be impactful. It must instead recognize Mr. Maly's humanity. And that is what he asks the court to do in sentencing him. Not to condone his actions—he was found guilty. Not to excuse them—he acknowledges the need for punishment. But to consider the role that grace ought to play given gravity of the events surrounding Mr. Maly's criminal activity. In considering how to respond to once in a generation acts of violence, this country could chose to follow its own (failed) history or that of others. *See* Pieter Hugo and Susan Dominus, *Portraits of Reconciliation: 20 years after the genocide in Rwanda, reconciliation still happens one encounter at a time*, N.Y. Times., April 6,

2014, available at https://www.nytimes.com/interactive/2014/04/06/magazine/06-pieter-hugo-rwanda-portraits.html.

The sentencing guidelines ask the court to make a scapegoat of Mr. Maly—to sentence him more harshly than nearly any others who have engaged in similar conduct. The only meaningful distinction between Mr. Maly and others is that he was convicted after a trial at which he testified. But in the face of what led to the events of January 6, should those factors account for the bulk of his sentence? Surely not.

**Why Mr. Maly's conduct is not deserving of a lengthy prison sentence.**

Mr. Maly did not bring weapons with him when he came to Washington on January 6. Instead, he packed a couple of ham sandwiches. He did not bring body armor with him, zip ties, or radio equipment. He did not bring a uniform, gas mask, or truncheon. He came to watch the president speak, as he was invited to do. Mr. Maly's lack of preparation for any assault helps to show that he was not planning to engage in any criminal actions that day. This absence of premeditation mitigates his culpability. More importantly, the fact that Mr. Maly did not bring a weapon demonstrates that his crimes were merely those of opportunity—and an opportunity unique in this country's history. Had nearly empty pepper spray cans not been tossed about, Mr. Maly may never have even held a weapon. Unlike many this court is sentencing, Mr. Maly's only use of pepper spray was barely observable. Contrast the sprays of hundreds that day which were persistent and visible for long periods

of time with the sprays attributed to Mr. Maly—all of which last less than a second and are barely visible.

Moreover, Mr. Maly did not engage in physical acts of violence. Mr. Maly was only at the front of the mob for seconds. And rather than pound against the line of officers barricading the tunnel, Mr. Maly retreated. He left. He did not stay in the tunnel. He did not join the throng pushing against officers, shouting "Heave!" He did not grab officers by their masks or shields. He did not assault them with bicycle racks or flag poles. He did not throw objects at them or bludgeon them. He left. Faced with the most violent aspect of the mob, Mr. Maly knew that he should not remain there. And he left. He did what we would want people to do. When he saw a line of police officers barricading an entrance, he turned around. He did not do so immediately, nor did anyone else.[2] He acted consistent with those around him who were not engaging in overt acts of violence. When it became apparent that he should leave and that being at the Capitol was unlawful and wrong, he left.

This court is also faced with the fact that the weapon Mr. Maly was convicted of using is one that is routinely used against people who are passively resisting law enforcement. The government is asking the court to condone on the one hand law enforcement's regular use of pepper spray and also condemn as deadly force any personal use of it against law enforcement. Officers—none of whom have been prosecuted—are depicted at various points using pepper spray indiscriminately

---

[2] Mr. Maly is short of stature. There is no evidence he could have seen the line of officers before he was nearly upon them. And the available evidence shows that he was in the tunnel briefly and left shortly after arriving.

against the crowd. And officers regularly are seen to use pepper spray and harsher chemical weapons against passive individuals. Unless the government plans to radically redefine the use of force continuum used by every police department in this country, the government ought not consider minor amounts of pepper spray used in outdoor settings to be seriously harmful. To be clear, Mr. Maly does not argue that he would have been justified in using force against the police—the state retains a monopoly on the legitimate use of violence. However, the government should not argue on the one hand that pepper spray is perfectly reasonable to use against unarmed civilians and on the other hand deadly or seriously dangerous when used against police.

**Why Mr. Maly's testimony should not be consider perjurious or held against him in determining his sentence.**

Mr. Maly exercised his constitutional right to testify at trial. The jury disagreed with his version of events. But that does not mean that Mr. Maly committed perjury. Mr. Maly could have told a version of events that he legitimately believed to be true, even if the jury did not believe that his version created a reasonable doubt about the government's evidence. Simply testifying to a version of events different than the government's version should not equate to a finding that Mr. Maly committed perjury. Indeed, the jury could have believed that Mr. Maly was legally responsible for his actions as an accomplice and believed that he told the truth in his testimony. Moreover, the jury could have found that Mr. Maly's actions in pointing pepper spray at officers constituted an assault. As such,

they could have believed Mr. Maly's testimony and still found him guilty of the charges leveled against him. Unlike many cases, Mr. Maly's testimony was not directly inconsistent with the jury's verdict. Given the charges and the culpability, and given the one question posed by the jury, his testimony could be found consistent with the verdicts.

**Why Mr. Maly's past minimally aggravates his position before the court, but also provides a story of redemption.**

This court should also account for Mr. Maly's personal story of redemption. Mr. Maly recognizes that he does not come before the court with a clean slate. Unlike many who participated in the January 6 events, Mr. Maly has a criminal record that includes violent crimes and felonies. Most of that record is directly a result of Mr. Maly's substance abuse. He struggled with drug addiction and was regularly involved in the criminal system while he abused drugs. However, Mr. Maly's criminal history is also a story that shows how people can overcome their past. Since relocating to Virginia, Mr. Maly's only interaction with the criminal system was through incidental motor vehicle infractions.

To be sure, Mr. Maly's criminal record aggravates his position before the court. But the court should also consider how prior criminal behavior was completely irrelevant in the events that led Mr. Maly to be at the Capitol on January 6. Surely someone's criminal record is less probative of the sentence to be imposed when the person engaged in behavior copied by thousands of others. Mr. Maly does not have the lengthiest criminal record of those who engaged in criminal

activity at the Capitol, nor have any data shown that a prior criminal record is associated with those crimes. Indeed, many people were part of the insurrection who had never before interacted with the American criminal legal system. How was Mr. Maly supposed to have known better given his criminal record than anyone else who was present at the Capitol? How can anyone say that his record makes his actions any more harmful or any more deserving of punishment? When facing unique events that cause massive criminal activity, surely a person's past is less important in deciding how to punish him.

Mr. Maly is a father who provides for his family. He works as a flooring contractor, earning a meager living and caring for his children. He spends what little spare time he has being a family man. One of his children has special needs, and Mr. Maly is devoted to his care and his rearing. His devotion to his family is shown by the overcoming of his criminal record and his substance abuse. His devotion to his family is shown by his perfect compliance on home detention awaiting his trial. His devotion to his family is shown, frankly, by his motivations in coming to Washington—however wrong his factual beliefs may have been, one cannot discount that he believed his actions were aimed at protecting this country.

Mr. Maly's case shares much more in common with those this court has sentenced to less than sixty months than those this court has sentenced far above that period of time. Mr. Maly is not asking for the court to impose a specific sentence. He intends to appeal his conviction. His counsel suggests that this court impose a sentence of 36 months. Such a sentence is commensurate with others who

engaged in minor acts of violence, but who were not responsible for wanton property destruction, planning, organizing, or enticing others, nor serious acts of violence that caused identifiable injuries. Such a sentence is commensurate with his humanity, and is sufficient, but not greater than necessary.

    Respectfully submitted,

    /s/ Benjamin Schiffelbein
    Counsel for Mr. Maly
    Assistant Federal Public Defender
    Western District of Virginia
    210 First Street SW, Ste 400
    Benjamin_Schiffelbein@fd.org
    540 777 0880